**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CHRISTOPHER BROCKINGTON,**
Central Detention Facility
1901 D Street SE
Washington, D.C. 20003

**MICHAEL SINGLETON,**
Central Detention Facility
1901 D Street SE
Washington, D.C. 20003

**STEPHAN HARPER,**
Central Detention Facility
1901 D Street SE
Washington, D.C. 20003

**TONY MCCLAM,**
Central Detention Facility
1901 D Street SE
Washington, D.C. 20003

*individually and on behalf of all others similarly situated,*

*Plaintiffs,*

v.

**DISTRICT OF COLUMBIA**, *a municipal corporation,*
1350 Pennsylvania Avenue NW
Washington, D.C. 20004

**THOMAS FAUST**, *in his official capacity as Director of the D.C. Department of Corrections,*
3924 Minnesota Avenue NE, 2nd Floor
Washington, D.C. 20019

*Defendants.*

Case No. 26-cv-3877

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Christopher Brockington, Michael Singleton, Stephan Harper, and Tony McClam ("Plaintiffs"), on behalf of themselves and a class of similarly situated individuals detained at the District of Columbia's Central Detention Facility ("D.C. Jail"), allege as follows:

## PRELIMINARY STATEMENT

1. This case seeks declaratory and injunctive relief to remedy unlawful, unsanitary, and uninhabitable conditions at the D.C. Jail.

2. The D.C. Jail is falling apart, and its residents—who have no choice but to rely on Defendants for their health and safety—are collateral damage. Plaintiffs and putative class members are detained individuals who regularly contend with malfunctioning plumbing that leads to erupting toilets and water leaks, sweating walls and prolific mold growth, extreme temperatures and poor air ventilation, and rampant infestations of mice and insects.

3. These dilapidated conditions have been ongoing for years. The D.C. Jail has become so hazardous that the Office of the District of Columbia Auditor ("D.C. Auditor") and the Council for Court Excellence ("CCE") concluded in their 2025 audit that the conditions "seriously affect the health and well-being of residents and [] staff."[1] The report found that the District of Columbia Department of Corrections ("DOC") "fails to maintain consistently clean, hygienic, and safe conditions," "does not adequately control parasites, vermin, and mold," and "fails to maintain consistent healthy temperatures."[2] The D.C. Auditor determined that the facility is both "outdated" and "dangerous" and reported that the death rate at the D.C. Jail is over three and a half times the national average.[3]

---

[1] Office of the D.C. Auditor & Council for Court Excellence, *Urgent Need for New D.C. Jail* 15 (May 28, 2025), https://dcauditor.org/report/dc-jail-report-update-report-5-28-25/ [hereinafter "2025 D.C. Auditor Report"].

[2] *Id.* at 1.

[3] Tom Fitzgerald, *D.C. Jail's Death Rate More Than Three Times the National Average, Audit Says*, Fox 5 Wash. (May 28, 2025), https://www.fox5dc.com/news/dc-jails-death-rate-more-

4. The conditions at the D.C. Jail are so dire that the *Washington Post* Editorial Board declared the facility a "disgrace," observing that the 2025 D.C. Auditor report was "far from the first time city officials have been warned that the building is unsuitable to house inmates."[4]

5. Just last month, the United States Department of Justice initiated a civil rights investigation into the D.C. Jail to determine whether DOC engages in a pattern or practice of violating the constitutional rights of residents. This investigation followed "numerous allegations regarding conditions in D.C. DOC facilities."[5] Notably, these allegations include a "fail[ure] to provide safe and sanitary physical conditions of confinement."[6]

6. The abysmal conditions at the D.C. Jail have also caught the attention of this Court. In November 2025, a D.C. District Court judge observed that an individual was "undoubtedly" harmed by "unnecessary pretrial detention" because the facility "currently suffers rising deaths, structural decay, staff shortages" and is "ridden with cockroaches, mice, and mold."[7] The court specifically noted "various health and safety risks," including "toilet water commingled with feces spewing onto residents and their living areas" and "extreme heat or cold due to poor climate-control systems."[8]

7. Plaintiffs Christopher Brockington, Michael Singleton, Stephan Harper, and Tony McClam are individuals detained at the D.C. Jail, either pre-trial, pending alleged violations of

---

than-three-times-national-average-audit-says.

[4] Editorial Board, *D.C.'s Jail Is a Disgrace. Still.*, Wash. Post (June 4, 2025), https://www.washingtonpost.com/opinions/2025/06/04/dc-jail-audit-bowser/.

[5] Press Release, U.S. Dep't of Just., *Justice Department Notifies the District of Columbia of Investigation into Whether Conditions in the D.C. Department of Corrections Correctional Facilities Violate the Constitution* (Oct. 19, 2026), https://www.justice.gov/opa/pr/justice-department-notifies-district-columbia-investigation-whether-conditions-dc-department [hereinafter "DOJ 2026 Press Release"].

[6] *Id.*

[7] *United States v. Gaffney*, 812 F. Supp. 3d 49, 80 (D.D.C. 2025) (citation modified).

[8] *Id.*

community supervision, or post-conviction. They face malfunctioning plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations. Their experiences are not isolated incidents; they reflect the hazardous conditions that shape the day-to-day lives of the approximately 1,500 individuals who reside in the facility. The District's failure to meaningfully address these conditions strips residents of their basic human dignity.

8. Conditions at the D.C. Jail pose an excessive or unreasonable risk to the health or safety of Plaintiffs and putative class members, and violate the United States Constitution. Defendants also breach the duty of care owed to Plaintiffs and putative class members, amounting to negligence.

9. Because of Defendants' ongoing, unlawful acts, Plaintiffs seek class-wide declaratory and injunctive relief.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it raises claims arising under the Constitution of the United States.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants are located in this judicial district, Plaintiffs are detained in this district, and Plaintiffs' claims for relief arise in this district.

12. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–2202, 42 U.S.C. § 1983, Federal Rules of Civil Procedure 57 and 65, and the inherent equitable powers of this Court.

## PARTIES

13. Plaintiff Christopher Brockington is a 42-year-old individual who is currently detained at the D.C. Jail. He has been detained since March 2026. He is being held based on an alleged technical violation of supervised release and is pending revocation.

14. Plaintiff Michael Singleton is a 39-year-old individual who is currently detained at the D.C. Jail. He has been detained since November 2025. He is being held in pre-trial custody and is presumed innocent.

15. Plaintiff Stephan Harper is a 26-year-old individual who is currently detained at the D.C. Jail. He has been detained since June 2025. He has pleaded guilty and is awaiting sentencing.

16. Plaintiff Tony McClam is a 36-year-old individual who is currently detained at the D.C. Jail. He has been detained since July 2019. He has pleaded guilty and is awaiting sentencing.

17. Defendant District of Columbia is a municipal corporation and the local government of Washington, D.C. It operates and governs the Department of Corrections pursuant to the laws of the District of Columbia.

18. Defendant Thomas Faust, the Director of the District of Columbia Department of Corrections, is being sued in his official capacity. The Department of Corrections is responsible for "the safekeeping, care, protection, instruction, and discipline of all persons committed to" the D.C. Jail. D.C. Code § 24-211.02(a). As Director, Defendant Faust is responsible for developing, administering, and enforcing Department of Corrections policies. *See id.* § 24-211.01.

## FACTUAL ALLEGATIONS

### I. The D.C. Jail is a 50-year-old dilapidated facility.

19. The District of Columbia's Central Detention Facility ("D.C. Jail") houses three primary classes of individuals: (1) individuals charged with a crime who are detained pre-trial; (2)

individuals who have been convicted of a crime and are awaiting sentencing or are serving sentences that are less than one year; and (3) individuals held in relation to violations of community supervision conditions.[9] Individuals at the D.C. Jail are housed across three floors, each with a north and south wing.[10]

20. The facility is an aging building that began operating 50 years ago in 1976.[11]

21. In recent years, the D.C. Jail has fallen into disrepair, as its mechanical and plumbing systems regularly break down, including its sewer, vent, and water lines, which the District of Columbia Department of Corrections ("DOC") readily admitted in 2025 and 2026 were at the "end of their life spans."[12]

22. At the same time, the population at the D.C. Jail has continued to grow, further straining the already compromised infrastructure of the aging building. In the last year, the

[9] *See* 2025 D.C. Auditor Report, *supra* note 1, at 7. Community supervision can include supervised release and probation.

[10] The housing units are named by wing (North, Northeast, Northwest, South, Southeast, and Southwest) and floor (1, 2, and 3). *See* D.C. Corrs. Info. Council, *Correctional Treatment Facility & Central Detention Facility Inspection Report FY 2017*, at 7 (Jan. 8, 2018), https://cic.dc.gov/sites/default/files/dc/sites/cic/publication/attachments/Updated%20-%20CIC%20Inspection%20Report%20on%20DOC%20FY%202017%20-%202.14.18.pdf.

[11] 2025 D.C. Auditor Report, *supra* note 1, at 6.

[12] D.C. Dep't of Corrs., Resp. to Performance Oversight Hearing Questions before the D.C. Council Comm. on the Judiciary & Pub. Safety, at 299 (2025), available to download as "DOC Responses to Council Question_02.24.25_submit version.pdf" at https://lims.dccouncil.gov/Hearings/hearings/653 [hereinafter "2025 DOC Resp. to Hearing Questions"]; *see also* D.C. Dep't of Corrs., Resp. to Performance Oversight Hearing Questions before the D.C. Council Comm. on the Judiciary & Pub. Safety, at PDF page 287 (2026), https://dccouncil.gov/wp-content/uploads/2026/03/responses.pdf [hereinafter "2026 DOC Resp. to Hearing Questions"].

population of the D.C. Jail rose over 16 percent, from 1,323 in July 2025 to 1,540 in June 2026.[13] Just two years prior, the population in May 2024 was 1,270.[14]

23. As of October 30, 2026, the population of the D.C. Jail was 1,509.[15]

24. Despite these increasing numbers, Defendants have failed to take adequate measures to ensure that the conditions at the D.C. Jail meet basic constitutional requirements. Over the years, each outside entity that has inspected the facility has consistently found endemic problems. For example, the Office of the District of Columbia Auditor ("D.C. Auditor") and Council for Court Excellence ("CCE") made extensive findings last year regarding the "dangerous and unhealthy environment [at the D.C. Jail] that does not meet the duty of care the District owes," concluding that Defendants "fail[] to maintain consistently clean, hygienic, and safe conditions," "do[] not adequately control parasites, vermin, and mold," and "fail[] to maintain consistent healthy temperatures."[16]

25. In June 2025, an attorney from Disability Rights D.C. ("DRDC"), the District's designated protection and advocacy agency for people with disabilities, provided testimony to the D.C. Council about observations from a visit to the D.C. Jail, stating, "[i]mmediate action is needed to address the untenable conditions. Mold and dried rust stains pepper cell walls and ceilings. Water from plumbing between cells leaks into the main walkways, cell sinks do not work, and the

---

[13] D.C. Dep't of Corrs., *DOC Population Statistics* (2026), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DOC%20Population%20Statistics%20Average%20Daily%20Population%20for%20January%202017%20through%20June%202026.pdf (Central Detention Facility figures).
[14] *Id.*
[15] D.C. Dep't of Corrs., *Daily Population Report from October 24th through October 30th 2026* (Oct. 30, 2026), https://doc.dc.gov/sites/default/files/dc/sites/doc/documents/The%20Daily%20Population%20Report%20from%20October%2024th%20through%20October%2030th%202026.pdf (Central Detention Facility figures).
[16] 2025 D.C. Auditor Report, *supra* note 1, at 1, 6.

units are unbearably hot. A few years ago, I only saw rodents occasionally; now it's surprising if I do not see multiple rodents during my visits."[17] The same attorney visited the D.C. Jail again this year and testified that she continued to see mice and "pools of urine or water leaking from the plumbing closets" among other unsanitary conditions.[18]



*Photos of a Shower Area (left) and a Cell (right) Taken During a DRDC Visit in June 2025.*[19]

26. Despite repeated warnings about these unlivable conditions, the situation continues to deteriorate under the District's watch. As detailed below, a combination of malfunctioning

[17] Natasha Walls Smith, Supervising Attorney, Disability Rights D.C., Testimony before D.C. Council Comm. on the Judiciary & Pub. Safety, Department of Corrections Budget Hearing, at PDF page 229 (June 16, 2025), https://lims.dccouncil.gov/downloads/LIMS/57950/Oversight_Hearing_Record/HR26-0055-Oversight_Hearing_Record.pdf?Id=214841 [hereinafter "DRDC 2025 Testimony"].
[18] Natasha Walls Smith, Supervising Attorney, Disability Rights D.C., Testimony before D.C. Council Comm. on the Judiciary & Pub. Safety, Department of Corrections Budget Hearing (May 6, 2026), https://dc.granicus.com/player/clip/10604?view_id=28&redirect=true (00:37:30).
[19] DRDC 2025 Testimony, *supra* note 17, at PDF pages 230–231.

plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations poses an excessive or unreasonable risk to the health or safety of the approximately 1,500 residents at the D.C. Jail.

## II. From erupting toilets to mold-infested cells, unsanitary conditions permeate every aspect of Plaintiffs' and putative class members' day-to-day life.

***Malfunctioning Plumbing and Leaks***

27. The plumbing systems throughout the D.C. Jail are outdated, degraded, and malfunctioning, leading to regular floods and leaks throughout the facility.

28. On any given day, residents may encounter a wide range of flooding, including toilets that erupt with human waste, shower drains that overflow, and chase closets that leak.[20]

29. Clogged or overflowing toilets in cells can lead to major flooding that affects entire tiers and lasts for hours at a time. The toilets shoot out feces- and urine-infested water, covering the cell and hallway floors in raw sewage. During these incidents, residents often remain trapped in their locked cells, sometimes for hours, exposed to contaminated standing water.

30. Residents who work as cleaners in the facility ("cleaning detail") are often forced to clean up toilet floods with limited cleaning supplies and protective gear.

31. Even in the limited instances where residents are provided with cleaning products, they receive insufficient quantities of products or ineffective, watered-down disinfectants to clean contaminated areas.

32. An unannounced 2021 inspection by the United States Marshals Service ("USMS") revealed "large amounts of standing human sewage (urine and feces) in the toilets of multiple

[20] Upon information and belief, chase closets are closets that are positioned between individual cells and contain pipes. These closets may be referred to by a number of names by residents, DOC, and outside inspectors, such as "utility closets," "water closets," or "plumbing closets."

occupied cells."[21] Inspectors noted that "the smell of urine and feces was overpowering in many locations" and that in two housing units, water "had been shut off for days, inhibiting detainees from drinking water, washing hands, or flushing toilets."[22]

33. In its last published inspection report from 2024, the District of Columbia Department of Health ("DOH") noted "leaking plumbing fixtures," "continuous water flow or no water flow in handwashing sinks," "clogged drains," and leaks coming out of "pipe chases located between the cells . . . where incoming water functions are regulated."[23]

34. In 2025, the D.C. Auditor reviewed work orders between July 1, 2023 and June 30, 2024 that DOC staff designated as the highest priority to be addressed.[24] An overwhelming majority of those work orders—84 percent—involved plumbing issues.[25]

35. This troubling pattern continued after the audit period. Between July 1, 2024 and June 30, 2025, approximately 85 percent of highest-priority work orders across DOC facilities were again for plumbing problems, most of which were from the D.C. Jail.[26] For example, between

---

[21] Memorandum from Lamont J. Ruffin, Acting United States Marshal, D.C., to Quincy Booth, Director of D.C. Dep't of Corrs., at 2 (Nov. 1, 2021), available at https://www.washingtonpost.com/context/u-s-marshals-service-nov-1-memo-to-d-c-dept-of-corrections-re-d-c-jail-inspection/1ecd5c89-1655-4e86-9ccc-28f432af78c5/ [hereinafter "USMS Memorandum"].

[22] *Id.*

[23] D.C. Dep't of Health, *D.C. Jail Inspection Report*, at PDF page 20–21 (2024), https://lims.dccouncil.gov/downloads/LIMS/61059/Introduction/RC26-0145-Introduction.pdf?Id=230497 [hereinafter "2024 DOH Report"]. The most recent published inspection report from DOH is from January 2024. Although the DOH is required under law to conduct a minimum of three inspections of the D.C. Jail a year, D.C. Code § 7-731(a)(a-1)(1), it has not disclosed any inspection reports from 2025 and 2026 in response to Freedom of Information Act requests.

[24] 2025 D.C. Auditor Report, *supra* note 1, at 19.

[25] *Id.*

[26] D.C. Dep't of Corrs., *Priority 1 Workorder Completion Times* (on file). Work orders include repairs done in all DOC facilities, including the Correctional Treatment Facility and the D.C. Jail. D.C. Jail entries make up the majority of Priority 1 work orders.

April 10, 2025 and April 15, 2025, staff entered work orders for inoperable toilets, sinks, or water issues in 29 cells across eight different units in the D.C. Jail.[27]

36. The D.C. Auditor's 2025 report also found multiple resident grievances related to "toilet water backing up between cells and flooding other areas of the jail" and "toilet water comingled with feces spewing onto residents and their living areas."[28]

37. These plumbing deficiencies are longstanding. Over a decade ago, a 2015 report by the Washington Lawyers' Committee for Civil Rights and Urban Affairs found water penetration in the walls and plumbing leaks throughout the D.C. Jail, describing the "physical condition" as "alarming."[29] In 2019, another report by the D.C. Auditor similarly found that the DOH issued recurring citations for "[l]eaking damages or inoperable plumbing fixtures" in the D.C. Jail from 2014 through 2018.[30]

38. Residents' experiences over the last several years echo these findings. In November 2024, a resident on Northwest 1 watched the toilet in his cell overflow continuously for several days. He could not clean up the contaminated water until the flooding stopped. The only way to slow the flood was to put a wet vacuum hose into the toilet to suck up the sewage.

39. In May 2026, a resident on Southwest 2 saw raw sewage overflowing from the toilet in the cell across from his, spilling onto the main hallway between cellblocks. Residents on cleaning detail used squeegees to push the feces and urine across the hallway toward the showers, spreading the sewage and leaving stains on the floor for weeks.

---

[27] *Id.*
[28] 2025 D.C. Auditor Report, *supra* note 1, at 19.
[29] Wash. Lawyers' Comm. for Civ. Rts. & Urb. Affs., *D.C. Prisoners: Conditions of Confinement in the District of Columbia* 2 (June 11, 2015), https://www.washlaw.org/pdf/conditions_of_confinement_report.pdf.
[30] Office of the D.C. Auditor, *Poor Conditions Persist at Aging D.C. Jail; New Facility Needed to Mitigate Risks* 8 (Feb. 28, 2019), https://dcauditor.org/report/poor-conditions-persist-at-aging-d-c-jail-new-facility-needed-to-mitigate-risks/ [hereinafter "2019 D.C. Auditor Report"].

40. This was not an isolated incident: the same resident witnessed the cleaning detail push sewage down the tier without chemicals in response to flooding at least six times in one year.

41. Showers are another source of flooding and leaks. In its October 2026 report, the District of Columbia Corrections Information Council ("CIC"), which inspects the D.C. Jail regularly, reported as a key finding that there were "flooded and stopped up showers with standing water inside of them, and there were shower handles with water shooting out."[31]

42. Issues with the showers are also not new. In a 2021 report, the CIC found that multiple units "had holes in the roof of the showers"; in North 1, "the roof of the shower area was caving in, potentially exposing residents to falling debris," and the "drains were flooded."[32] In 2024, the CIC reported in South 1 that "there were areas missing from the roof of the shower area and other areas within the shower space."[33]

43. Chase closets positioned between cells are yet another source of leakage. One resident housed in Northwest 1 in early 2025 regularly saw the chase closet leak into his cell. He reported that residents used blankets to keep liquid out.

---

[31] D.C. Corrs. Info. Council, *Department of Corrections Central Detention Facility, Correctional Treatment Facility, and Central Cell Block Report on Findings and Recommendations* 5 (Oct. 8, 2026), https://cic.dc.gov/sites/default/files/dc/sites/cic/documents/DOC%20CDF%20CTF%20CCB%20FY26Q3.pdf [hereinafter "Oct. 2026 CIC Report"].

[32] D.C. Corrs. Info. Council, *DC Department of Corrections Inspection Report* 7, 9 (Sept. 30, 2021), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/CIC%20Inspection%20Report%20DOC%20FY%202021%20site%20visit%20May%202021.pdf.

[33] D.C. Corrs. Info. Council, *Department of Corrections Central Detention Facility, Correctional Treatment Facility, and Central Cell Block Report on Findings and Recommendations* 6 (Apr. 25, 2024), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/DOC%20Quarterly%20Inspection%20Report%20FY24%20Q1.pdf.

44. Since there are many different sources of leaks and floods throughout the D.C. Jail, residents often wake up to water leaking into their cells and do not know the source or whether the water flooding their cell is contaminated.

45. DOC's own records confirm that floods can last for hours and impact entire floors of housing units. On December 3, 2024, DOC staff submitted a work order for Northwest 1 stating that "[t]oilets 27-40 are backing up and they are flooding into the tier. The inmates were dealing with this issue since 11:30 pm."[34] The work order entry shows that work was not "completed" until 7:09 am.[35]

46. These issues are not limited to a single area of the facility. CIC inspections have documented plumbing-related leaks and floods throughout the D.C. Jail. In its 2025 annual report, the CIC stated as a key finding that "in *every* housing unit the CIC visited, there were leaks or floods in various areas, such as the [chase] closets and showers."[36]

47. Water is turned off for extended periods of time in response to floods, leaving residents unable to flush their toilets or wash their hands. Even when water is running, residents complain of inconsistent water pressure and unclean water coming from the cell sinks, which is sometimes the only water available to drink. This is consistent with DOH reporting from 2024, which confirmed that sometimes water "pressures were too high, and water poured onto the floor from the faucet," but at other times, it was "too low, and water was barely flowing. Some cells had no incoming water at all, hot or cold."[37]

---

[34] D.C. Dep't of Corrs., *Priority 1 Workorder Completion Times* (on file).
[35] *Id.*
[36] D.C. Corrs. Info. Council, *FY2025 Annual Report on the D.C. Department of Corrections* 7 (Dec. 9, 2025), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/DOC%20Annual%20Rep%20FY25_KM%2012.9.25.pdf (emphasis added) [hereinafter "2025 CIC Annual Report"].
[37] 2024 DOH Report, *supra* note 23, at PDF page 21.

48. In June 2025, residents reported to DRDC that "they had been without running water for several days due to plumbing issues."[38]

49. When water is running, residents do not know if it is safe to drink. For example, a resident on South 3 observed that the sink water was dirty with visible particles. When he drank the water, it felt like swallowing sand and made his throat sore. This same resident, while housed in Northwest 3, also reported drinking contaminated water from a fountain that had previously been spewing black sludge.

50. For the past two years, DOC has reported to the D.C. Council that the D.C. Jail's sewage and vent lines—pipes that ensure waste is carried away and that there is proper air pressure within those pipes, preventing sewage gases from entering the building—as well as its hot- and cold-water lines, are at the "end of their life spans."[39]

51. Plaintiffs are forced to face the risks of living in a building with a malfunctioning plumbing system. Plaintiff Tony McClam experienced flooding from several exploding toilets between August and October 2025. During these incidents, sewage water shot out of the toilets and covered his cell floor with feces-laced water, damaging his shoes and clothing. These floods were a regular occurrence. Even after maintenance attempted to address the issues, they continued.

52. Several months later, in early 2026, Mr. McClam was trapped in a locked cell in Southwest 1 overnight while the cell flooded with sewage water. The flooding came from a nearby cell, and Mr. McClam pleaded with staff to let him out, but they ignored him. Instead, staff instructed Mr. McClam to push the contaminated water through the small crack under his closed door. He ended up on his knees, sweeping the water with his bare hands and a washcloth. After

---

[38] DRDC 2025 Testimony, *supra* note 17, at PDF page 231.
[39] 2025 DOC Resp. to Hearing Questions, *supra* note 12, at 299; 2026 DOC Resp. to Hearing Questions, *supra* note 12, at PDF page 287.

being exposed to raw sewage for hours, Mr. McClam's body began to itch, and an attorney had to e-mail DOC staff to get him access to a shower to clean himself. This was not the only time that Mr. McClam had been locked in a cell with raw sewage for hours.

53. In July 2026, Plaintiff Christopher Brockington likewise endured several successive floods on his unit, Northwest 1. The first flood filled the entire bottom tier or level of the unit, leaving residents' belongings floating in its wake. The water had feces, urine, blood, and vomit in it. Mr. Brockington waded through this contaminated water that was up to his knees. The flooding reached his bed sheets, ruined his property, including his clothes, his only pair of shoes, books, and commissary food, and left the unit smelling like sewage.

54. Plaintiffs Michael Singleton and Tony McClam experienced this same flood. Mr. McClam, who was on cleaning detail at the time, observed a plumber attempt to unclog a shower drain during the flood, only for more black sludge to come out of that drain. The plumber left the mess, and Mr. McClam and other residents cleaned up for hours with a watered-down cleaning liquid, but without any bleach. Even though Mr. McClam was on cleaning detail, he did not receive work boots or a mask while wading through sewage water.

55. Later that same month, another flood resulted from a toilet explosion in Northwest 1, with flooding in approximately 10 cells. Human waste erupted from those toilets and covered the cell floors in sewage. Staff did not provide Mr. McClam with cleaning rags or a wet vacuum. He resorted to using a squeegee and a dustpan to scoop water into a mop bucket, and he was then forced to wipe feces that was smeared all over the floor with tissues from his room. Because staff did not provide bleach or adequate cleaning supplies, this flood exposed residents to contaminated water.

56. The toilets on Northwest 1 often sit filled with dirty water, even when they are not erupting. These toilets overfill and spill onto the floor. Mr. Brockington has woken up to people screaming to staff for help because their cells were filling with dirty water.

57. Throughout his time at the D.C. Jail, across different units, Plaintiff Stephan Harper has also experienced multiple malfunctioning toilets, floods, and leaks. In July 2025, the toilet in his cell in Southeast 3 began to overflow. Urine, feces, and food floated to the top rim of the toilet and started spilling onto the cell floor. The stench was overpowering, but Mr. Harper could not escape it in his locked cell. He sat next to raw sewage until the next day.

58. This year, the toilet in his cell in Southwest 1 stopped working for several days. Urine and feces that did not flush remained in the toilet bowl next to where Mr. Harper ate and slept. Although Mr. Harper was allowed to use the toilet in other cells, he sometimes had to wait four to six hours with sewage in his cell before staff let him out to use the bathroom.

59. Consistent with external inspections, Mr. Harper has observed that chase closets are a source of leaks. Across units, Mr. Harper has witnessed water from chase closets leaking into cells, including his own.

60. Most recently, in August 2026, a flood began in Southwest 1 when a shower drain overflowed, eventually flooding the bottom tier of the unit. Then, toilets in two cells near the shower started to shoot out sewage water, further exacerbating the flood. The water reached Mr. Harper's and other residents' cells.

61. Because no squeegees were readily available, Mr. Harper used his own towel to absorb brown water with chunks of feces, repeatedly wringing out wet, contaminated belongings with his bare hands. Even after he obtained a squeegee, he received no cleaning sprays or other supplies to clean up the filthy residue left behind.

62. Mr. McClam, Mr. Brockington, Mr. Singleton, and Mr. Harper's experiences are typical of residents at the D.C. Jail, who regularly experience flooding and water leaks related to the facility's malfunctioning plumbing system.

63. The DOH warns that people should not "directly contact" sewage and that contact with sewage-contaminated water can lead to various harmful gastrointestinal diseases such as E. coli and hepatitis A, as well as skin infections.[40]

64. The ongoing plumbing problems at the D.C. Jail, which regularly expose Plaintiffs and putative class members to contaminated sewage and harmful bacteria, parasites, and viruses, pose an excessive or unreasonable risk to their health or safety. These risks are amplified by Defendants' failure to provide adequate cleaning supplies and protective equipment when floods inevitably occur.

***Excessive Moisture and Mold***

65. Water penetrates and leaks through windows, walls, and ceilings at the D.C. Jail, often resulting in excessive moisture and standing water—an ideal environment for mold growth.

66. The presence of moisture throughout housing units in the D.C. Jail is chronic and well-established. For example, in late 2023 and early 2024, DOH inspectors found "[s]ignificant water penetration" in cell blocks in the Northwest 1 unit.[41] They also observed wet cells with black stains in North 2, cell walls damaged by water penetration in North 3, and water dripping from the ceilings in Southwest 3.[42] In sum, inspectors observed excessive moisture and water across all three floors of the D.C. Jail.

---

[40] *Preventing Illnesses Associated with Sewage*, D.C. Dep't of Health, https://dchealth.dc.gov/sites/default/files/dc/sites/doh/Preventing%20Illnesses%20Associated%20with%20Sewage%20Exposure_one%20pager_r8.pdf (last visited Oct. 28, 2026).
[41] 2024 DOH Report, *supra* note 23, at PDF page 21.
[42] *Id.* at PDF page 22.

67. DOC inspections similarly confirm these issues. For example, on one day in March 2025, staff documented wet walls or floors in five different cells in a unit.

Date 3/7/25 Housing Unit NW-1 Inspector [redacted] Signed [redacted]

| Cell | Cell Door (P1) | | Light (P1 if no lights or wires are exposed) | | Toilet & Sink (P1 if toilet can't flush or sink has no water or if either is clog[illegible]) | | | Bunks & Furniture | | BAR/ Window & Walls | | Vent (P1 if there is poor air flow) | | Overall Sanitation | | Corrective Actions Required/Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Compliance | | Compliance | | Compliance | | | Compliance | | Compliance | | Compliance | | Compliance | | |
| | Yes | No | Yes | No | Yes | No | Pressure | Yes | No | Yes | No | Yes | No | Yes | No | |
| 61 | ✓ | | ✓ | | ✓ | | | ✓ | | ✓ | | ✓ | | ✓ | | |
| 62 | | | | | | | | | | | | | | | | WET WALLS/FLOOR |
| 63 | ✓ | | ✓ | | ✓ | | | ✓ | | ✓ | | ✓ | | ✓ | | |
| 64 | ✓ | | ✓ | | ✓ | | | ✓ | | ✓ | | ✓ | | ✓ | | |
| 65 | ✓ | | ✓ | | ✓ | | | ✓ | | ✓ | | ✓ | | ✓ | | |
| 66 | | | | | | | | | | | | | | | | WET WALLS/FLOOR |
| 67 | | | | | | | | | | | | | | | | WET WALLS/FLOOR |
| 68 | ✓ | | ✓ | | ✓ | | | ✓ | | ✓ | | ✓ | | ✓ | | |
| 69 | ✓ | | ✓ | | ✓ | | | ✓ | | ✓ | | ✓ | | ✓ | | |
| 70 | ✓ | | ✓ | | ✓ | | | ✓ | | ✓ | | ✓ | | ✓ | | |
| 71 | | | | | | | | | | | | | | | | WET WALLS/FLOOR |
| 72 | | | | | | | | | | | | | | | | WET WALLS |
| 73 | | | | | | | | | | | | | | | | MOLDS |
| 74 | ✓ | | ✓ | | ✓ | | | ✓ | | ✓ | | ✓ | | ✓ | | |

*Excerpt of Housing Unit Cell Inspection Sheet (on file).*

68. Residents throughout the D.C. Jail similarly describe their cells as having sweating walls that are constantly wet due to condensation, leaking ceilings, and puddles of standing water, which worsen when it rains. This moisture leads to orange rust and seeps into residents' bedding and belongings.

69. In December 2024, a resident could not walk around his own cell in socks because of water puddles on the floor. Similarly, in early 2025, another resident had so much standing water in his cell that his feet would get wet even when he walked around in sandals.

70. Residents try to remove moisture from their cells by wiping walls and puddles with their own towels, but it quickly returns. This excessive moisture unsurprisingly leads to prolific mold growth throughout the housing units and showers at the D.C. Jail, peppering walls and baseboards with visible spots.

71. DOC's own reporting to the D.C. Council confirms that mold growth is rampant in the D.C. Jail. From October 2023 to January 2025, DOC received reports of mold in 294 locations throughout the D.C. Jail, including in individual cells and showers on all three floors; 95 percent of those reports resulted in identified mold.[43]

72. On one day alone in January 2025, mold was identified in 26 cells in North 1; on another day that month, mold was identified in 12 cells in Northwest 1.[44] From February 2025 to December 2025, DOC staff received additional reports of potential mold in 135 locations, with testing confirming mold in 97 percent of those locations.[45]

73. Any abatement efforts by DOC have proven woefully inadequate. Its reporting confirmed that mold recurred in the same locations multiple times in a year, indicating that mold growth outpaced any remedial efforts made.[46]

74. Reporting by the CIC also documents the pervasiveness of mold during inspections of the D.C. Jail. In its November 2025 report, the CIC found "recurring mold in cells."[47]

75. Residents consistently report that their cells are filled with mold and smell mildewed. One resident, while housed in Northwest 3, reported that an entire wall of his cell was covered in dark mold spots. The walls sweated so much that pools of black water built up on the floor. He could not use the back half of his cell because it was so wet.

---

[43] 2025 DOC Resp. to Hearing Questions, *supra* note 12, at 300–307.
[44] *Id.*
[45] 2026 DOC Resp. to Hearing Questions, *supra* note 12, at PDF pages 291–297.
[46] *Id.*; 2025 DOC Resp. to Hearing Questions, *supra* note 12, at 307.
[47] D.C. Corrs. Info. Council, *Department of Corrections Central Detention Facility, Correctional Treatment Facility, and Central Cell Block Report on Findings and Recommendations* 5 (Nov. 17, 2025), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/DOC%20CDF%20CTF%20CCB%20FY25Q4.pdf.

76. Another resident described the mold in his cell as slimy and fuzzy. The same resident noted that around April 2025, the mold spread to his jail-issued canvas shoes. He had to buy a new pair with his own money.

77. The D.C. Auditor specifically recommended to Defendants that "whenever mold is present in the jail, it should be more rapidly and consistently abated . . . using a certified mold specialist" and "regular precautionary steps should be taken, like identifying leaks and repairing those leaks, more frequently."[48]

78. Nonetheless, residents consistently report that any of DOC's attempts to remove patches of mold from cells do not involve lasting measures to remediate it. In fact, staff often direct residents to wipe and paint the moldy areas of their cells themselves. But superficial steps such as spraying walls with cleaner and then applying a coat of paint are not effective. The mold quickly returns and eats through the paint.

79. In its June 2026 report following an announced inspection, CIC reported that it visited cells in Northwest 3 that previously appeared to have "widespread" mold.[49] CIC noted that the cells "still smelled" of mold, which "appeared to have been concealed with paint."[50] Residents communicated that they were "given bleach to scrub the walls themselves and staff had painted over the mold as opposed to remediating it."[51]

---

[48] 2025 D.C. Auditor Report, *supra* note 1, at 25.
[49] D.C. Corrs. Info. Council, *Department of Corrections Central Detention Facility, Correctional Treatment Facility, and Central Cell Block Report on Findings and Recommendations* 7 (June 4, 2026),
https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/DOC%20CDF%20CTF%20CCB%20FY26Q2.pdf [hereinafter "June 2026 CIC Report"].
[50] *Id.*
[51] *Id.*

80. In its most recent October 2026 report, CIC again noted that it "appeared that [] mold was painted over recently" in cells in the same unit.[52] Residents reported that the "day before the CIC inspection, residents with alleged mold issues inside of their cells were given bleach in an attempt to clean it, as well as paint to cover the affected areas."[53]

81. Outside of scheduled inspections by external entities, residents report that disinfectants such as bleach are rarely, if ever, passed around. The disinfectant that is distributed appears watered down and is ineffective at cleaning mold. Even when residents wipe down spots of mold, dark stains remain on the walls.

82. Exposure to mold makes it difficult for people at the D.C. Jail to breathe. Over the years, Plaintiff Tony McClam's asthma and tonsillitis have flared up multiple times due to exposure to mold in cells he has resided in throughout the facility. For example, in December 2025, Mr. McClam had trouble breathing and had to use his inhaler after exposure to mold growing near his bed in Southwest 1. Earlier that year, mold exposure in a different unit, Northwest 1, gave Mr. McClam a painful sore throat, triggering pre-existing issues with his tonsils that made it feel like his throat was closing up. The mold had a strong odor, and it continued to grow unchecked as he watched water leak in from the windowsill on his back wall.

83. In 2025 and 2026, Mr. McClam complained about mold several times after experiencing difficulty breathing. Early in 2026, the USMS inspected his moldy cell, which prompted staff to move Mr. McClam multiple times to different cells in the unit, all of which also had mold or other issues. He ended up in a cell where he observed hairy mold in circular formations on his wall, with a strong, foul odor.

---

[52] Oct. 2026 CIC Report, *supra* note 31, at 7.
[53] *Id.* at 8.

84. Plaintiff Michael Singleton, while living on Southwest 1, was also forced to live in a moldy cell. The mold grew in patches on the walls next to the bunk bed he slept on. Mr. Singleton experienced migraines and headaches. When he complained to staff, they told him and his cellmate to wipe down the mold with a rag. This was ineffective, and mold grew back.

85. Plaintiff Stephan Harper has similarly lived in a number of moist, moldy cells during his time at the D.C. Jail. In North 1, greenish-brown mold covered the back wall of his cell, just inches from where he slept. The cell walls looked as though they were sweating, and they were so wet they could not hold up a calendar. The floors were also always wet. If Mr. Harper stood in his cell with socks on, his feet would get wet.

86. Recently, in Southwest 1, mold growth began at the bottom of Mr. Harper's cell and appeared in patches on the back wall. Mr. Harper observed what appeared to be dark green mold in several cells across from him that housed residents. Even when residents were given spray bottles and rags to wipe away the mold, it grew back quickly. Mr. Harper also observed mold and grime in the shower areas.

87. Mr. Brockington has lived with mold. The walls and ceilings of his cell in Northwest 3 were covered in what appeared to be dark fungus stains. Mr. Brockington also experienced moldy and grime-filled showers. Around August 2026, Mr. Brockington developed a fungal infection on his feet from the contaminated showers, which can cause emergency complications given his underlying medical conditions. Medical staff advised him to stop washing his feet because he would spread the fungal germs from the shower floor to the rest of his body.

88. Mr. McClam, Mr. Singleton, Mr. Harper, and Mr. Brockington's experiences are typical of residents at the D.C. Jail, who all contend with exposure to mold on an ongoing basis.

89. As noted by the D.C. Auditor, "continuous exposure to mold among those who spend excessive time indoors" can result in illness "caused by contaminants that breed in stagnant water from things like ducts, humidifiers, drain pans, or other places where water has collected."[54]

90. Mold releases spores into the air that aggravate allergies and respiratory illnesses, making it especially difficult for people with serious pre-existing conditions to breathe. According to the Centers for Disease Control and Prevention, people with "asthma or who are allergic to mold" can have "severe reactions" when exposed.[55] Immune-compromised people can also contract "infections in their lungs from mold."[56] The foul odor of mold can also worsen breathing difficulties, especially when coupled with the poor air circulation at the D.C. Jail.

91. The persistent and widespread presence of mold in living areas poses an excessive or unreasonable risk to the health or safety of Plaintiffs and putative class members.

***Extreme Temperatures and Poor Ventilation***

92. The D.C. Jail often has extreme temperatures, which are exacerbated by a lack of air circulation. Residents describe the air in their cells as stale due to poor airflow.

93. Depending on the temperature outside, common areas and cells are either extremely hot or cold. Temperatures fluctuate throughout the building and even within a single housing unit at any given time.

94. As the D.C. Auditor reported last year, "[r]esidents and others with first-hand experience with DOC facilities consistently reported that maintaining appropriate temperatures was an issue."[57]

---

[54] 2025 D.C. Auditor Report, *supra* note 1, at 24–25.
[55] *Mold*, Ctrs. for Disease Control & Prevention (Sept. 26, 2024), https://www.cdc.gov/mold-health/about/index.html.
[56] *Id.*
[57] 2025 D.C. Auditor Report, *supra* note 1, at 21.

95. In hot and humid D.C. summers, residents' cells are sweltering. The vents in the cells often do not work, with either no air or hot air blowing out. The CIC's 2025 report noted "[v]entilation and temperature issues in [Southwest 2 and Northwest 2]," with "no air circulating" on one side of the units.[58] In fact, even though there "were fans present in the common area," there was "little to no air flow in the cells," with cells described as "hot and stuffy."[59]

96. In its most recent October 2026 report, CIC reported as one of its key findings that "[f]ans in the housing units needed to be cleaned, which were caked with dust."[60]

97. These findings are consistent with the D.C. Auditor's report that DOC "fails to maintain consistent healthy temperatures," having reviewed "[m]ultiple grievances . . . referenc[ing] facilities being too hot."[61] For example, one resident wrote that there was "no AC the past weeks" and that despite telling staff of the problem, "[t]hey still have not resolved the issue" and the resident was not able to "sleep or do anything without sweating."[62] The resident, who had bronchitis, informed DOC that "it is hard . . . to breath[e] . . . I sometimes feel so hot I could pass out right now."[63]

98. At times, the temperature in the D.C. Jail was hotter inside the building than outside, "likely due to heat absorption by the building itself."[64]

99. The temperatures in the D.C. Jail are made worse by constant fluctuations and irregularity. As a service provider at the jail stated, "depending on the weather there's either no

[58] 2025 CIC Annual Report, *supra* note 36, at 7.
[59] *Id.* at 20.
[60] Oct. 2026 CIC Report, *supra* note 31, at 5.
[61] 2025 D.C. Auditor Report, *supra* note 1, at 21.
[62] *Id.*
[63] *Id.*
[64] *Id.* at 22.

heat or no[] air conditioning . . . You'll be in the hallway and it'll be freezing and you'll go into the unit and it'll be hot."[65]

100. The erratic temperatures and DOC's inability to maintain a safe temperature are not new. The CIC reported as a key finding in its 2021 annual report that "[t]here is no air conditioning at the jail."[66]

101. That same year, in December 2021, the United States Marshals Service removed hundreds of individuals in federal custody from the D.C. Jail after an unannounced inspection uncovered unlivable conditions. One individual told reporters that "there were serious issues" with the unit he was in: "Hot in the summer without no air conditioning . . . Cold in the winter with no heat. You know where you had to wear four layers of clothes to keep warm."[67]

102. These issues have only continued. For example, on January 10, 2025, DOC staff entered a work order that a cell in Northwest 1 was "too cold" with temperatures below 65 degrees.[68]

103. One resident living on South 3 in 2026 explained that the summer heat is unbearable. Because South 3 is the mental health unit, the slots on residents' cell doors are always closed, resulting in even less air circulation. The resident reported regularly hearing people screaming about feeling trapped in their hot cells but that staff did not let them out. He noted that illnesses seemed to spread quickly on the unit, seemingly related to the lack of air circulation.

---

[65] *Id.* at 21–22.

[66] D.C. Corrs. Info. Council, *District of Columbia Department of Corrections 2021 Annual Report* 3 (Jan. 25, 2022), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/DOC%20FY%202021%20annual%20report%20Final_KM%201.24.22.pdf.

[67] Valerie Bonk, *Rare Look Inside DC Jail After Serious Living Conditions Uncovered*, WTOP News (Dec. 8, 2021), https://wtop.com/dc/2021/12/rare-look-inside-dc-jail-following-issues-uncovered-by-the-us-marshals/.

[68] D.C. Dep't of Corrs., *Priority 1 Workorder Completion Times* (on file).

104. Plaintiffs' experiences mirror prior reporting. Plaintiff Michael Singleton has endured extreme temperatures for months across multiple units. During the winter, Mr. Singleton's cell was so cold that he could see air coming out of his mouth when he breathed, and he was forced to stay wrapped in blankets and thermals. During the summer, Mr. Singleton reported that when it was sweltering outside, there was no relief inside. He could only sleep in boxers—without sheets or a blanket—because his cell was so hot. Anytime he left his cell, he was so sweaty that he felt as though he needed to shower.

105. During a town hall meeting, Mr. Singleton and other residents spoke to DOC staff about the unbearable heat, the dirty vents, and the lack of circulation. Despite their complaints, nothing changed.

106. Plaintiff Stephan Harper has also experienced poor air circulation and hot temperatures. Like Mr. Singleton and other residents who have complained to staff, Mr. Harper has found little meaningful difference between inside and outside temperatures in housing units: when it is hot outside, it is hot and stuffy inside. Although staff occasionally claim to adjust temperatures and turn on air conditioning or heat, any relief—if it comes—is temporary and inconsistent. Instead, stagnant air is the norm.

107. Plaintiff Tony McClam's asthma has suffered due to the facility's temperature problems. In the middle of summer, his cell had no air conditioning. Instead, hot air blew out of the vent, exacerbating his asthma symptoms and making it difficult to breathe. At other times in the year, his cell felt so frozen that he struggled to think. He would wrap his head in thermals to try and conserve body heat. His breath was so cold that his glasses fogged up.

108. Plaintiff Christopher Brockington has also endured extreme heat across multiple housing units. He has become so dehydrated from sweating that he has felt as though he was going

to pass out. Dehydration is particularly risky for Mr. Brockington because he has diabetes, making it harder for him to manage his blood sugar.

109. Mr. Singleton, Mr. Harper, Mr. McClam, and Mr. Brockington's experiences are typical of D.C. Jail residents.

110. The National Commission on Correctional Health Care states that "[e]xtreme indoor and outdoor temperatures adversely affect the health of people residing and working in carceral settings" as "[t]here is robust evidence that high temperatures in carceral facilities are associated with morbidity and mortality."[69] This is because "[h]igh temperatures impose physiological stress on the human body," with "older people, those with mental disorders, those who take medications that affect body temperature regulation, and those who have certain comorbidities at risk for hospitalization or death."[70]

111. Extreme temperatures in the prison environment are particularly concerning as "aging correctional facilities may not have adequate ventilation," which may "exacerbate extreme temperature exposure."[71]

112. Heat exposure in prison is also linked to suicidal behaviors—in one study, "the incident rate of suicide watches was 29% greater on days when the maximum heat index reached 80 to 89 °F and 36% greater on days climbing into the 90 to 103 °F range."[72] Another peer-

---

[69] Nat'l Comm'n on Corr'l Health Care, *Climate Control for Extreme Temperatures in Corrections* (2024), https://ncchc.org/wp-content/uploads/Climate-Control-for-Extreme-Temperatures-in-Corrections-2024.pdf.

[70] *Id.*

[71] Julianne Skarha et al., *An Overlooked Crisis: Extreme Temperature Exposures in Incarceration Settings*, 110 Am. J. Pub. Health S41 (2020), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305453.

[72] David H. Cloud et al., *Extreme Heat and Suicide Watch Incidents Among Incarcerated Men*, 6 JAMA Network Open (2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2808211.

reviewed study demonstrates "that people who are incarcerated in prison facilities may be particularly susceptible to heat-related mortality."[73]

113. Plaintiffs and putative class members face an excessive or unreasonable risk to their health or safety as a result of the extreme temperatures and poor ventilation in the D.C. Jail.

***Rampant Vermin and Pest Infestations***

114. Plaintiffs and putative class members routinely see mice, cockroaches, gnats, water bugs, and other insects throughout the D.C. Jail, including in shared living areas and their cells.

115. During its most recent audit of the jail, the D.C. Auditor interviewed witnesses who stated that "the facility has infestations of mice and roaches."[74] The D.C. Auditor reviewed DOC environmental reports and found that vermin infestation and rodent droppings were among the most common issues recorded in inspections of shared living areas.[75]

116. The D.C. Jail's pest problem, like its other sanitation problems, is not new. In 2023, the DOH observed during an inspection that despite the D.C. Jail having a pest control contractor, roaches, gnats, and dead mice were sighted in "several areas of the facility."[76]

117. Residents frequently stuff their clothing, towels, or bedding at the bottom of their cell doors to block mice from entering, with little success.

118. Mice continue to roam freely through housing units and living areas, crawling into residents' clothing and bedding, eating commissary food items in cells, and leaving gnawed packaging and droppings in their wake.

---

[73] Julianne Skarha et al., *Heat-related Mortality in U.S. State & Private Prisons: A Case-Crossover Analysis*, 18 PLoS One (2023), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0281389.
[74] 2025 D.C. Auditor Report, *supra* note 1, at 24.
[75] *Id.*
[76] D.C. Dep't of Health, *D.C. Jail Inspection Report* 14–15 (2023) (on file).

DC DEPARTMENT OF CORRECTIONS
MONTHLY ENVIRONMENT INSPECTION REPORT

PP 2920.4
Attachment B
Page 4 of 4

Date: Shift: Location:

Electrical:

Action Taken:

Other: Mice Running free

Action Taken:

[redacted]

Fire Protection Specialist Print | Officer Print

Fire Protection Specialist Sign | 3/24/25 Date | [redacted] Officer Sign | 3/24/25 Date

*NOTE: If deficiencies are observed, please indicate by placing a check mark in the appropriate square.*

*Excerpt from a March 2025 Inspection Sheet Documenting "Mice Running free" (on file).*

119. Residents report that rodent activity increases at night. The sound of mice scurrying across the floor makes it difficult to sleep.

120. One resident on South 3, the mental health unit, reported finding an entire family of mice on an old sticky trap and finding mouse nests with multiple babies squirming around.

121. The pest problem at the D.C. Jail is not limited to rodents. Residents frequently see small and large cockroaches move in and out of cells, shower areas, and hallways. They have observed that some of the cockroaches have wings and can fly.

122. Gnats, flies, and other insects also congregate in damp corners and spaces, including cells and showers. Residents report seeing fruit flies and small, worm-like parasites crawling on cell walls.

123. Plaintiffs similarly live with vermin and insects in their cells and housing units. Plaintiff Stephan Harper has been living beside cockroaches and mice for months. He has tried to stop their entry, to no avail, by putting a towel under his door. Mr. Harper regularly sees mouse droppings and cockroach legs in his cell and common areas. Despite several complaints, the pest problems persist. Mr. Harper has never seen an exterminator inspect living spaces for possible entry points, nor has he been provided traps or other pest-control methods for his cell.

124. Plaintiff Michael Singleton also has vermin issues in his cell and living areas. Despite his written complaints, Mr. Singleton noticed more and more rodents. He cannot leave commissary food out because pests will get into it, and he has stuffed his own clothing under his door to keep them from entering his cell. When Mr. Singleton sees pest control, they sometimes leave without doing anything, or other times lay down a glue trap or two, which does not address the infestations.

125. Plaintiff Christopher Brockington similarly contends with bugs, mice, and their droppings. He sees mice running around his unit, so much so that staff have asked residents to try to catch them because they enter into staff offices. Around August 2026, Mr. Brockington felt a cockroach crawl from his hair down onto his back while he was taking a shower. The next month, he saw a cart that was covered in dozens of little roaches.

126. Plaintiff Tony McClam has also dealt with mice and cockroaches in every unit he has lived in. He has watched mice squeeze under his door, and the sound of mice eating through his packaged commissary would wake him up at night. Cockroaches also moved in and out of his cell and burrowed into his shoes while he showered. He has also seen roaches crawl around a housing unit, coming in and out of vents, sinks, cells, and showers.

127. Mr. Harper, Mr. Singleton, Mr. Brockington, and Mr. McClam's experiences epitomize those of D.C. Jail residents living among vermin and their droppings.

128. The Centers for Disease Control and Prevention warns about bacterial and viral diseases that can spread through contact with rodents, including breathing in contaminated air, touching surfaces rodents have traversed, and being scratched or bitten.[77] For example, leptospirosis is a bacterial infection spread through rodent and other animal urine, and can lead to kidney damage and meningitis if not treated.[78] Other bacterial diseases spread through rodents include salmonella and tularemia.[79] Hantavirus is another serious infection that can spread through rats and mice, even through indirect contact with urine, droppings, and saliva.[80]

129. The D.C. Jail's vermin and pest infestations expose Plaintiffs and putative class members to an excessive or unreasonable risk to health or safety.

## III. The District has been aware of the D.C. Jail's unsanitary conditions for years and fails to meaningfully act.

130. The District has long known about the unsanitary conditions at the D.C. Jail and the health risks they pose. The facility's environmental problems are well documented.

131. Years of external inspections and on-site visits by the D.C. Auditor, CCE, CIC, USMS, and DOH alike consistently reveal ongoing systemic issues regarding malfunctioning plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations.

---

[77] *Controlling Wild Rodent Infestations*, Ctrs. for Disease Control & Prevention (Apr. 8, 2024), https://www.cdc.gov/healthy-pets/rodent-control/index.html.
[78] *About Leptospirosis*, Ctrs. for Disease Control & Prevention (Feb. 10, 2026), https://www.cdc.gov/leptospirosis/about/index.html.
[79] *Controlling Wild Rodent Infestations*, *supra* note 77.
[80] *About Hantavirus*, Ctrs. for Disease Control & Prevention (May 13, 2024), https://www.cdc.gov/hantavirus/about/index.html.

132. In 2019, the D.C. Auditor inspected and reviewed years of DOH inspections. It declared the D.C. Jail an "aging and deteriorating" facility, after finding it was "repeatedly cited" for "water penetration through the walls due to a leaking roof, mold growth on walls, damaged water stalls, and temperatures outside of allowable standards."[81] The D.C. Auditor observed, "[u]nfortunately, these issues are not new," and that they jeopardized the "health and safety of inmates and staff, adding to the risk of litigation."[82]

133. Two years later, the USMS conducted an unannounced inspection at the D.C. Jail and uncovered "grotesquely poor sanitation."[83] Its findings highlighted problems with mold, leaks, sewage, and plumbing and concluded there was "evidence of systemic failures."[84] As a result, the USMS announced an intent to move the 400 individuals in federal custody at the D.C. Jail elsewhere because conditions "[did] not meet minimum standards of confinement."[85]

134. In 2024, the DOH reported that there was "water penetration through the walls," along with "grey to black stains . . . on the walls of shower and inmate cells," "leaking plumbing fixtures," and general filth such as "toilets [that] were dirty with stains and dirt rings, and sinks [that] were visibly unsanitary."[86]

135. More recently, the D.C. Auditor again flagged serious health risks throughout the facility in its 2025 report, such as "toilet water comingled with feces spewing onto residents and

---

[81] 2019 D.C. Auditor Report, *supra* note 30, at 17.
[82] *Id.* at 7, 9.
[83] Press Release, U.S. Sen. Comm. on the Judiciary, *Durbin, Grassley, Cardin Press DOJ on Egregious Conditions at Prison Facility in Nation's Capital* (May 6, 2022), https://www.judiciary.senate.gov/press/dem/releases/durbin-grassley-cardin-press-doj-on-egregious-conditions-at-prison-facility-in-nations-capitol.
[84] USMS Memorandum, *supra* note 21, at 1.
[85] *See* Statement by the U.S. Marshals Service, Re: Recent Inspection of DC Jail Facilities (Nov. 2, 2021), https://www.usmarshals.gov/news/press-release/statement-us-marshals-service.
[86] 2024 DOH Report, *supra* note 23, at PDF page 29.

their living areas."[87] The report concluded that "DOC fails to maintain consistent clean, hygienic, and safe conditions and does not adequately control parasites, vermin, and mold."[88]

136. These widely cited and circulated findings led the Editorial Board of the *Washington Post* to declare the D.C. Jail a "disgrace," observing that this was "far from the first time city officials have been warned that the building is unsuitable to house inmates" and calling for the District to "focus on the serious problems . . . regarding how the jail is managed."[89]

137. In reports from June and October 2026, CIC again confirmed "ongoing issues with alleged mold," "flying bugs inside of cells," "flooded and stopped up showers with standing water inside of them," "shower handles with water shooting out," and fans "caked with dust."[90]

138. Just last month, the United States Department of Justice initiated a civil rights investigation into the D.C. Jail to determine whether DOC engages in a pattern or practice of violating the constitutional rights of residents held there. This investigation followed "numerous allegations regarding conditions in D.C. DOC facilities, including a report from the District of Columbia's own Auditor."[91] These allegations include a "fail[ure] to provide safe and sanitary physical conditions of confinement."[92]

139. Defendants themselves have openly acknowledged for years the health and safety concerns posed by the unsanitary living conditions at the D.C. Jail. In 2021, in response to a DOH inspection, DOC admitted the scope of these problems, explaining that "[m]op closets and shower areas within the housing unit suffer from a number of structural and mechanical deficiencies. Original exhaust duct systems and doors are rusting and deteriorated and plumbing systems are

[87] 2025 D.C. Auditor Report, *supra* note 1, at 19.
[88] *Id.* at 23.
[89] *D.C.'s Jail Is a Disgrace. Still.*, *supra* note 4.
[90] June 2026 CIC Report, *supra* note 49, at 5; Oct. 2026 CIC Report, *supra* note 31, at 5.
[91] DOJ 2026 Press Release, *supra* note 5.
[92] *Id.*

experiencing increasing end-of-life failures."[93] DOC also stated that despite having replaced parts of the facility's roof, "[d]eficiencies in the roof system are contributing to water infiltration in the building."[94]

140. Now, the story remains the same. In advance of oversight hearings in 2026, in response to a question about "chronic maintenance issues" at the D.C. Jail, DOC reported to the D.C. Council that "over time, infrastructure deteriorates, leading to issues such as leaking roofs, corroded plumbing, and outdated electrical systems, all of which increase maintenance costs and create safety hazards for staff and inmates."[95]

141. DOC further admitted that these "health and safety concerns [were] significant, with environmental hazards like asbestos and mold posing risks."[96]

142. Resident grievances, staff work orders, and internal inspections have likewise put Defendants on notice of chronic and recurring maintenance issues in the D.C. Jail. For example, between July 1, 2023 and June 30, 2024, DOC staff generated 1,595 work orders for high-priority health or safety-related maintenance issues—an average of more than four a day.[97] As previously stated, 84 percent of these work orders concerned plumbing issues.[98] Work orders from the following year demonstrate a nearly identical pattern.[99]

143. Despite years of consistent findings detailing unsanitary conditions and general decay, including inspections recommending specific corrective actions, as well as Defendants'

---

[93] D.C. Dep't of Corrs., *Office of Accreditation and Compliance Inspection Response: Corrective Action Plan* 4 (Apr. 2021) (on file).
[94] *Id.* at 6.
[95] 2026 DOC Resp. to Hearing Questions, *supra* note 12, at PDF page 37.
[96] *Id.* at PDF page 38.
[97] 2025 D.C. Auditor Report, *supra* note 1, at 19.
[98] *Id.*
[99] D.C. Dep't of Corrs., *Priority 1 Workorder Completion Times* (on file).

own admission that the health and safety concerns were "significant," Defendants fail to meaningfully act to address these ongoing health or safety issues.[100]

144. Defendants fail to take the basic step of regularly cleaning and sanitizing cells and common areas or providing residents with sufficient cleaning supplies to do so.

145. Moreover, necessary structural repairs have languished under Defendants' watch, including the D.C. Jail's aging sewage and hot- and cold-water lines, as well as its insulation and ventilation systems, which need repair or replacement to address the plumbing, mold, and temperature issues. Instead of addressing these major concerns, DOC has attempted ineffective stopgap measures or ignored problems altogether.

146. For instance, DOC has a sanitarian on staff to inspect cells for mold, test samples, and recommend abatements.[101] But the sanitarian's remediation efforts are like a game of whack-a-mole. Some patches of mold may be identified, sprayed, and painted over, but this cosmetic patchwork is short-lived. Defendants' own reporting last year to the D.C. Council indicates that mold growth at the jail remains rampant, often returning to the same cells that were previously wiped down and painted.[102]

147. Defendants' superficial approach to mold abatement does not address root causes, such as excess moisture from water leaks and penetration throughout the walls, coupled with poor ventilation, which encourage mold proliferation. Because the underlying issues remain unaddressed, the mold quickly resurfaces.

148. Similarly, Defendants acknowledge that the D.C. Jail's sewer lines are near the end of their life, and that the "main drain and supply systems . . . remain the most significant plumbing

---

[100] *See* 2026 DOC Resp. to Hearing Questions, *supra* note 12, at PDF page 38.
[101] *See* 2025 DOC Resp. to Hearing Questions, *supra* note 12, at 308.
[102] 2026 DOC Resp. to Hearing Questions, *supra* note 12, at PDF pages 291–297; 2025 DOC Resp. to Hearing Questions, *supra* note 12, at 307.

concern."[103] But Defendants attempt to band-aid these serious structural problems, to no avail. Reports of overflowing and exploding toilets, leaking showers, and chase closets continue. In some instances, despite reports of sewage spewing out of toilets, Defendants leave residents locked in filthy, flooded cells for hours.

149. The infestations of mice and other pests also remains unchecked. Despite a contract with a pest control company, detained individuals report daily sightings of insects and other vermin. The current approach to pest control is failing because pests appear to still enter the building through unaddressed cracks or other entry points. Residents consistently report that they rarely see pest control measures, either from staff or an outside company.

150. Beyond structural decay, Defendants fail to do the bare minimum on routine upkeep. A 2024 DOH inspection revealed "circumstances that showed preventive maintenance was not performed consistently[,] as evidenced by the mechanical and physical disrepair" throughout the D.C. Jail.[104]

151. That same year, CIC inspections "discovered that there has been a lack of documentation and communication between correctional officers working the different shifts about maintenance issues" in a housing unit.[105] The D.C. Auditor then concluded that Defendants' paper-based system for internal staff inspections prevents DOC leadership from identifying and responding to "repeat and systemic problems with facilities."[106]

---

[103] 2026 DOC Resp. to Hearing Questions, *supra* note 12, at PDF page 298.
[104] 2024 DOH Report, *supra* note 23, at PDF page 29.
[105] D.C. Corrs. Info. Council, *Department of Corrections Central Detention Facility, Correctional Treatment Facility, and Central Cell Block Report on Findings and Recommendations* 6 (Oct. 29, 2024), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/DOC%20FY24Q3%20report%20.pdf.
[106] 2025 D.C. Auditor Report, *supra* note 1, at 26.

152. Moreover, Defendants fail to meaningfully address conditions issues because of a broken grievance system. Residents who try to submit grievances often face resistance or indifference. Defendants frequently ignore or reject grievances for minor technical reasons, such as failing to attach a copy of an informal grievance to a formal grievance, even when residents do not have a copy to attach because DOC failed to return one. This failure to take resident complaints seriously is yet another example of Defendants' failure to act.

153. The measures that Defendants have taken to patch up major structural and maintenance issues are woefully inadequate, as conditions problems remain persistent and ubiquitous. Defendants themselves have admitted as much to the D.C. Council earlier this year, stating that the D.C. Jail "face[s] numerous challenges that impact safety, efficiency, and compliance."[107] But compliance with constitutional standards is not optional.

154. As the *Washington Post* Editorial Board acknowledged last year, residents at the D.C. Jail "are no less worthy of basic living standards. The criminal justice system's mission must be rehabilitation when possible—but that is impossible when those living behind bars suffer in unsanitary or dangerous conditions."[108]

## **CLASS ACTION ALLEGATIONS**

155. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs bring the claims in this action on behalf of a class of all individuals who are or will be detained at the D.C. Jail, including the following subclasses: (1) individuals who are now, or in the future will be, detained at the D.C. Jail pre-trial or based on an alleged violation of community supervision ("Fifth Amendment subclass"); and (2) individuals who are now, or in the future will be, detained at the D.C. Jail following a criminal conviction ("Eighth Amendment subclass"). All Plaintiffs are

[107] 2026 DOC Resp. to Hearing Questions, *supra* note 12, at PDF page 37.
[108] *D.C.'s Jail Is a Disgrace. Still.*, *supra* note 4.

members and proposed representatives of the putative class. Plaintiffs Christopher Brockington and Michael Singleton are members and proposed representatives of the putative Fifth Amendment subclass; Plaintiffs Stephan Harper and Tony McClam are members and proposed representatives of the putative Eighth Amendment subclass.

156. Plaintiffs reserve the right to amend or modify the class definition or to establish additional subclasses as appropriate if discovery or further investigation reveals that the class should be expanded or otherwise modified.

157. The putative class meets the requirements of Federal Rule of Civil Procedure 23(a).

158. **Numerosity.** The putative class is so numerous that joinder is impracticable. As of October 30, 2026, the population of the D.C. Jail was 1,509.[109] Joinder is inherently impracticable for that reason alone. Joinder is also impracticable for other, independent reasons. The putative class includes an unknown number of unnamed, future class members who will be detained at the D.C. Jail and, by definition, cannot be joined. Further, putative class members are highly unlikely to file individual suits on their own behalf given practical barriers, including their detained status and indigency, that limit their ability to file suit.

159. **Commonality.** Defendants maintain systemwide policies or practices that govern conditions in the D.C. Jail, and their failure to maintain a constitutionally adequate level of sanitation creates an excessive or unreasonable risk to the health or safety of all putative class members. The claims of the putative class share common issues of fact and law, including but not limited to whether Defendants expose residents to malfunctioning plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations, and whether Defendants' policies or practices that allow for these conditions violate the Fifth and

---

[109] *Daily Population Report*, *supra* note 15.

Eighth Amendments to the United States Constitution and amount to negligence. The resolution of these questions will drive the ultimate outcome of the litigation.

160. **Typicality.** Plaintiffs' claims are typical of those of the class as a whole. Plaintiffs currently reside at the D.C. Jail and are in Defendants' custody. Plaintiffs' claims arise from the same unsanitary conditions throughout the D.C. Jail and Defendants' practices that result in these conditions, providing the same basis for all putative class members' claims.

161. **Adequacy.** Plaintiffs are adequate class representatives and meet all requirements of Federal Rule of Civil Procedure 23(a)(4). They have no conflicts of interest with other class members, will fairly and adequately protect the interests of the class, and understand their responsibilities as class representatives. Counsel for Plaintiffs have extensive experience with the factual and legal issues involved in representing individuals detained at the D.C. Jail and in litigating class actions and complex federal cases asserting constitutional violations.

162. Defendants have acted or refused to act, and continue to do so, on grounds generally applicable to the class, thereby making relief appropriate as to the class as a whole. The class may therefore properly be certified under Federal Rule of Civil Procedure 23(b)(2).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### FIFTH AMENDMENT – 42 U.S.C. § 1983
### (Plaintiffs Brockington, Singleton, and the Fifth Amendment subclass)

163. The Fifth Amendment's Due Process Clause prohibits subjecting individuals in pre-trial detention to "conditions or restrictions . . . [that] amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

164. Defendants are violating Plaintiffs' and putative class members' Fifth Amendment due process rights because they "recklessly fail[] to act with reasonable care to mitigate the risk[s]"

that unsanitary conditions pose, "even though [they] kn[o]w, or should [] know[], that the condition[s] posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

165. The D.C. Jail's malfunctioning plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations, in part or in combination, pose an excessive risk to Plaintiffs' and putative class members' health or safety. Defendants know of, or should know of, the risks posed by the unconstitutional and unsanitary conditions, and recklessly fail to act with reasonable care to mitigate the risks.

166. As a result of Defendants' actions, Plaintiffs and class members are experiencing irreparable harm. On an ongoing basis, Plaintiffs and class members are exposed to risks to their health or safety.

167. The District of Columbia is liable under 42 U.S.C. § 1983 because it is the moving force behind the constitutional violations. The District knows or should know of a risk of constitutional violations, but is deliberately indifferent to that risk by failing to act.

**SECOND CLAIM FOR RELIEF**
**FIFTH AMENDMENT – INHERENT EQUITABLE POWER**
**(Plaintiffs Brockington, Singleton, and the Fifth Amendment subclass)**

168. The Fifth Amendment's Due Process Clause prohibits subjecting individuals in pre-trial detention to "conditions or restrictions . . . [that] amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

169. Defendants are violating Plaintiffs' and putative class members' Fifth Amendment due process rights because they "recklessly fail[] to act with reasonable care to mitigate the risk[s]" that unsanitary conditions pose, "even though [they] kn[o]w, or should [] know[], that the condition[s] posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

170. The D.C. Jail's malfunctioning plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations, in part or in combination, pose an excessive risk to Plaintiffs' and putative class members' health or safety. Defendants know of, or should know of, the risks posed by the unconstitutional and unsanitary conditions, and recklessly fail to act with reasonable care to mitigate the risks.

171. As a result of Defendants' actions, Plaintiffs and class members are experiencing irreparable harm. On an ongoing basis, Plaintiffs and class members are exposed to risks to their health or safety.

172. The District's violation of Plaintiffs' and putative class members' due process rights, carried out under color of law, may be enjoined under this Court's equitable power. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

**THIRD CLAIM FOR RELIEF**
**EIGHTH AMENDMENT – 42 U.S.C. § 1983**
**(Plaintiffs Harper, McClam, and the Eighth Amendment subclass)**

173. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.

174. Conditions of confinement violate the Eighth Amendment when they (1) pose a "sufficiently substantial 'risk of serious damage to [plaintiffs'] future health,'" and (2) prison officials act with deliberate indifference to those risks. *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

175. The D.C. Jail's malfunctioning plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations, in part or in combination, pose a sufficiently substantial risk of serious damage to health or safety. Defendants act with deliberate indifference to those risks.

176. As a result of Defendants' actions, Plaintiffs and class members are experiencing irreparable harm. On an ongoing basis, Plaintiffs and class members are exposed to risks to their health or safety.

177. The District of Columbia is liable under 42 U.S.C. § 1983 because it is the moving force behind the constitutional violations. The District knows or should know of a risk of constitutional violations, but is deliberately indifferent to that risk by failing to act.

**FOURTH CLAIM FOR RELIEF**
**EIGHTH AMENDMENT – INHERENT EQUITABLE POWER**
**(Plaintiffs Harper, McClam, and the Eighth Amendment subclass)**

178. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.

179. Conditions of confinement violate the Eighth Amendment when they (1) pose a "sufficiently substantial 'risk of serious damage to [plaintiffs'] future health,'" and (2) prison officials act with deliberate indifference to those risks. *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

180. The D.C. Jail's malfunctioning plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations, in part or in combination, pose a sufficiently substantial risk of serious damage to health or safety. Defendants act with deliberate indifference to those risks.

181. As a result of Defendants' actions, Plaintiffs and class members are experiencing irreparable harm. On an ongoing basis, Plaintiffs and class members are exposed to risks to their health or safety.

182. The District's violation of Plaintiffs' and putative class members' due process rights, carried out under color of law, may be enjoined under this Court's equitable power. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENCE**
**(Plaintiffs Brockington, Singleton, Harper, McClam, and the entire class)**

183. Defendants oversee the "management and regulation" of the D.C. Jail, and are "responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed" there. D.C. Code § 24-211.02(a).

184. Defendants' policies likewise establish that they are charged with "ensur[ing]" that the D.C. Jail is "clean, sanitary, and environmentally safe," and "that its facilities and equipment are maintained in good working order."[110]

185. Defendants systematically breach the duties owed to Plaintiffs and putative class members, who are residents in their care.

186. This failure amounts to negligence, which directly and proximately causes harm to Plaintiffs and putative class members, who are regularly exposed to malfunctioning plumbing and leaks, excessive moisture and mold, extreme temperatures and poor ventilation, and vermin infestations.

187. As a result of Defendants' actions, Plaintiffs and class members are experiencing irreparable harm. On an ongoing basis, Plaintiffs and class members are exposed to risks to their health or safety.

---

[110] *See* D.C. Dep't of Corrs., *Program Statement 2920.6C, Housekeeping Plan* (Mar. 3, 2017), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/PP%202920%206C%20Housekeeping%20Plan%2003032017.pdf.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs and putative class members respectfully request that the Court:

A. Certify the putative class under Federal Rule of Civil Procedure 23(b)(2) and appoint the named Plaintiffs as class representatives and the undersigned counsel as class counsel;

B. Declare that Defendants' failure to provide conditions of confinement that do not pose an excessive or unreasonable risk to Plaintiffs' and putative class members' health or safety is unlawful;

C. Order an unannounced inspection of the D.C. Jail by an outside environmental and facilities management expert to recommend specific remedial measures for water penetration, mold, pests, temperature control, plumbing, and any other structural repairs, and order follow-up inspections as necessary;

D. Enter injunctive relief in Plaintiffs' favor mandating that Defendants:

i. Conduct weekly inspections of cells to assess mold growth, leaks, plumbing issues, ventilation issues, and pests;

ii. Report results of all weekly inspections and regularly monitor and evaluate aggregate inspection reports;

iii. Ensure documented cleaning and sanitization of all areas on a set schedule, at least weekly, including housing units and common areas;

iv. Provide individuals in cells found to contain mold an opportunity to transfer to a cell without mold and stop housing individuals in cells with mold;

v. Ensure that mold found in cells and common areas is promptly and adequately remediated;

vi. Ensure that there is adequate air quality and ventilation throughout the facility,

including by cleaning fans, air vents, and other air filtration systems at least monthly; changing all air filters throughout the jail on a regular schedule; and ensuring that all air condition and heating fixtures are in good repair;

vii. Inspect pipes on a regular schedule to ensure they are in good repair and free from leaks, flooding, and other damage;

viii. Provide individuals in cells with flooding toilets an opportunity to transfer to a cell with functioning plumbing and stop housing individuals in cells with plumbing issues;

ix. Provide adequate cleaning supplies and personal protective equipment on a weekly basis to all residents;

x. Provide and ensure the ongoing use of cleaning chemicals that sufficiently address hazardous materials, including mold, human or animal waste, and sewage;

xi. Ensure adequate pest control throughout all housing units and common areas, including providing for routine pest control spraying and additional spraying as needed and responding promptly to complaints from residents regarding pest activity;

xii. Develop and implement a comprehensive maintenance plan to address ongoing environmental and facilities issues on a regular schedule, including management of mold, leaks, flooding, pests, humidity, ventilation, and temperature regulation;

xiii. Consult with an outside environmental and facilities management expert annually to evaluate and address necessary, ongoing repairs;

xiv. Ensure that any and all DOC staff working in sanitation receive training from a relevant professional association with emphasis on assessment of environmental health practices; and

xv. Commence all necessary repairs to sewage and vent lines, and hot- and cold-water lines;

E. Appoint an independent monitor with expertise in environmental and facilities management to ensure compliance with these conditions; and

F. Award such further relief as the Court deems appropriate.

Dated: November 3, 2026

Respectfully submitted,

/s/ Megan Yan
Megan Yan, D.C. Bar No. 1735334
Nabanita (Neeta) Pal, D.C. Bar No. 90036390
Safa Ansari-Bayegan, D.C. Bar No. 1725096
Nina Herth, D.C. Bar No. 90029061

PUBLIC DEFENDER SERVICE FOR THE DISTRICT OF COLUMBIA
633 3rd Street N.W.
Washington D.C. 20001
(202)-628-1200
myan@pdsdc.org
npal@pdsdc.org
sansaribayegan@pdsdc.org
nherth@pdsdc.org

*Counsel for Plaintiffs*